## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re:
**ILYA ABLAVSKY**,                                      Chapter 7
    Debtor                                          Case No. 12-18167

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**ILYA ABLAVSKY,**
    Plaintiff,
v.                                                       Adv. P. No. 12-01267
**UNITED STATES DEPARTMENT OF EDUCATION &**
**WESTERN NEW ENGLAND UNIVERSITY**
    Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed by Ilya Ablavsky ("Mr. Ablavksy" or the "Debtor") against the United States Department of Education ("US DOE") and Western New England University ("WNEU"), through which Mr. Ablavsky seeks a discharge of his outstanding student loan obligations to them, totaling $82,893.57 as of June 2013, pursuant to 11 U.S.C. § 523(a)(8). In his Complaint, Mr. Ablavsky asserts that repayment of his student loans would impose an undue hardship on him because he suffers from severe bipolar disorder, generalized anxiety disorder, post-traumatic stress disorder, and right hemisphere syndrome, all of which prevent him from obtaining

1

meaningful employment, now or in the future, that would permit him to repay his student loans.

In accordance with the Pretrial Order issued by this Court on December 3, 2012, the parties filed a Joint Pretrial Memorandum, which they later amended. The Court conducted a trial on December 4, 2013 at which time two witnesses  testified, the Debtor and Dr. Charles Popper, and numerous exhibits were introduced into evidence.

The Court has jurisdiction under 28 U.S.C. § 1334 and the order of reference issued by the United States District Court for the District of Massachusetts.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

The Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. PROCEDURAL BACKGROUND

The Debtor filed a Chapter 7 petition on October 5, 2012.  He commenced the instant adversary proceeding seeking to discharge his student loan debts on October 10, 2012.  He named four defendants:  Access Group, Inc., "Wells Fargo,"[1] WNEU, and US DOE.  Access Group, Inc. and Wells Fargo failed to answer, and the Clerk, on December 4, 2012, entered defaults against them. The Court entered default judgments against them on January 8, 2013, discharging the following loans:

> a. Wells Fargo loan for plaintiff's third year of law school with a balance of $35,590 at time of filing;

---

[1] The Debtor served a copy of the summons and complaint on Wells Fargo Education Financial Services.

    b. Wells Fargo bar exam loan with a balance of $8,165 at time of filing;
    c. Wells Fargo bar exam loan with a balance of $5,010 at time of filing;
    d. Access Group, Inc. loan for plaintiff's first and second year of law school
    with a balance of $60,619 at time of filing.

## III. FACTS

    A. <u>Stipulated Facts</u>

Pursuant to the Amended Joint Pretrial Memorandum, the parties agreed as to the

balance due on Mr. Ablavsky's student loans from WNEU and US DOE.  As of June 2013,

the Debtor owed WNEU $6,554.48 and the US DOE $76,339.09. The parties further agreed

that Mr. Ablavsky is a thirty-six-year-old male who was diagnosed with bipolar disorder

in 1997 when he was eighteen years old; that he enrolled in Western New England School

of Law in August of 2006 and used student loans to finance his education; and that he

graduated from Western New England School of Law in May 2009 and was admitted to

the Massachusetts bar on June 21, 2010.  The parties further agreed that in November of

2010, Mr. Ablavsky misappropriated a file from the Essex Superior Court in Salem,

Massachusetts and had it destroyed so it would be unavailable for use in a murder trial in

which his client in an unrelated matter was a defendant.  On January 26, 2012, Mr.

Ablavsky was convicted of the crime of tampering with an official record in violation of

Mass. Gen. Laws ch. 268, § 13E and was sentenced to eighteen months in the House of

Correction with sixty-four days served and the balance suspended with conditions.  As a

result of his criminal conviction, Mr. Ablavsky was indefinitely suspended from practice

by the Massachusetts Board of Bar Overseers by order dated May 21, 2012.

B. <u>The Evidence</u>

Mr. Ablavsky is a college and law school graduate. He obtained student loans from the US DOE in 1999 to finance his attendance at Brandeis University. In January of 2005, the US DOE granted Mr. Ablavsky an economic hardship deferment. The student loan owed to WNEU was to assist Mr. Ablavsky in financing his law school attendance. WNEU subsequently granted him two forbearances, one in 2011 and one in 2012. Although he passed the Massachusetts Bar Exam in 2010, as noted above, his license has been indefinitely suspended as a result of his criminal conviction. Reinstatement is unlikely due to his criminal record.

Mr. Ablavsky was born in St. Petersburg, Russia (the former Soviet Union) in 1976. He emigrated to the United States with his mother when he was nine years old. His parents divorced when he was a teenager. He always wanted to be a lawyer.

In 1997, Mr. Ablavsky, in addition to being diagnosed with bipolar disorder, was diagnosed with generalized anxiety disorder and panic disorder with agoraphobia. He was prescribed lithium at that time. Prior to that time, he received counseling for his disorders. In 2000, when he was twenty-one years old, he began receiving social security disability benefits. Since his diagnosis, he has been hospitalized seven times for mental illness. Despite significant impairment resulting from mental illnesses, Mr. Ablavsky graduated from high school, college, and law school.

His academic career, however, was not without incident. He was suspended from Brandeis University after making a bomb threat to a political opponent after he ran

4

unsuccessfully for mayor of Waltham, Massachusetts during a manic episode. He was arrested and spent almost nine months at Tewksbury State Hospital. It was determined that he was not criminally responsible for his behavior, although the Debtor intimated his conduct resulted in a criminal conviction.

Mr. Ablavsky attended two different state colleges before graduating from Salem State College in 2003 with a Bachelor of Arts degree in Political Science. He subsequently enrolled in Western New England School of Law in August 2003, which is part of WNEU, but dropped out after one week due to anxiety and depression. Thereafter, he obtained employment as a paralegal and a tutor working between ten and twenty hours per week, while attending a day treatment program.

In November of 2005, he was attacked and beaten by a neighbor, who beat him around the head with a metal pipe, resulting in injuries requiring 31 stitches to close the lacerations. As a result of this attack, he developed post-traumatic stress disorder and his other conditions worsened. Mr. Ablavsky testified that the neighbor was arrested, but he did not commence an action against him because he feared him and the neighbor had no money to satisfy a judgment for assault.

In 2006, Mr. Ablavsky re-enrolled in Western New England School of Law. Upon his re-enrollment, he was offered financial aid in addition to an $18,000 scholarship which was renewable conditioned upon grade performance. Mr. Ablavsky did not obtain the required grades for his scholarship and it was not renewed.

In December of 2007, before his second year of law school, Mr. Ablavksy married.

5

His spouse gave birth to a child on December 18, 2007.  In February of 2008, the couple separated and subsequently divorced six months later.  As part of the divorce settlement, the Debtor assumed responsibility for credit card debts incurred primarily by his spouse during the marriage.[2]

In May 2008, as a result of hospitalization for kidney problems, the Debtor was advised by his doctors to stop taking the lithium prescribed to him because of its effect on his kidney function. Without lithium, his mental health was less stable.  Mr. Ablavsky was prescribed other medications for his illnesses that were less efficacious.

In May of 2009, Mr. Ablavksy completed and graduated from law school with a C minus average and a class rank of 160 out of 182 total students.  After law school, while living in a subsidized apartment project in Lynn, Massachusetts, he took the bar exam.  He failed the bar exam, despite extra testing time in a distraction free environment, but succeeded in passing it the second time and was admitted to the Massachusetts bar.

Mr. Ablavsky was unable to find employment and, instead, went into solo practice against the advice of the Board of Bar Examiners.  He rented office space from an attorney in Lynn, Massachusetts who also rented space to other attorneys, including an attorney who abandoned her practice.  The Debtor was employed by some of her former clients but was overwhelmed, resulting in another mental breakdown. One such client was Jose Cabrera.  Mr. Cabrera engaged Mr. Ablavsky to pursue a malpractice claim against another attorney.  On November 3, 2010, Mr. Ablavsky stole the criminal case file of Mr.

---

[2] There was no testimony at trial as to the amount of the debts.

Cabrera, who was being represented by another attorney in a murder case in the Essex

Superior Court.  According to Mr. Ablavsky,

> I was actually so concerned about my mental state that I
> thought about going into an emergency room and checking
> into a hospital because I felt that I was completely out of
> control, and I really struggled within myself between the
> decision to either go to the courthouse and take the file or go
> to an emergency room and obviously, I made the wrong
> decision.

Mr. Ablavsky thought it would help Mr. Cabrera if the file in the murder case disappeared,

although he admitted at trial that  it accomplished nothing and that the idea was

nonsensical, if not delusional.

Mr. Ablavsky contacted Mr. Cabrera's criminal defense attorney and reported to

him that he had shredded the file.  That attorney reported him to the Board of Bar

Overseers, the District Attorney and the Superior Court.  Although the Debtor did not

personally destroy the file, when he attempted to have it returned to him, he was informed

that "the file was already gone." The Debtor was arrested on November 5, 2010 and

charged with tampering with a file.  Thee days later, he was committed to Bridgewater

State Hospital for an evaluation of competency to stand trial. His law license was put on

disability inactive status.  Thus, the Debtor's active law practice spanned less than five

months.

Although  Dr. Robert Joss concluded that he was not criminally responsible due to

a manic episode, Mr. Ablavsky pled guilty to the tampering charge in January of 2011 and

received a suspended sentence of eighteen months and  two years probation, having spent

7

two months in jail before being released to house arrest while awaiting trial.  His license to practice law was indefinitely suspended, and he is banned from the practice of law and from service as a paralegal.  The Debtor testified that rules of professional conduct prohibit attorneys from employing disciplined lawyers as paralegals. According to Mr. Ablavsky, he is certain that his license will never be reinstated.  Neither WNEU nor the US DOE challenged the Debtor on this point.

After his conviction, he worked for a few hours per week as an office assistant at a Jewish congregation but was terminated after a few weeks when his criminal record was discovered.  He has looked for work, and has done some tutoring on an hourly basis. Recently, he found, but at the time of trial had not accepted, temporary seasonal employment at a minimum wage as a bell ringer for the Salvation Army during the holiday season.  He also declined a position at PriceRite "pushing carriages" at a minimum wage. He offered to volunteer at a hospital as a translator, but was rejected due to his criminal record.

From the age of sixteen to date, Mr. Ablavsky has earned less than $70,000, according to a January 2, 2013 Social Security Statement.  On his amended Statement of Financial Affairs, he indicated that he earned $21,000 in 2010 from the practice of law ($19,593, according to the Social Security Statement).  He testified that he made a few payments to WNEU and to the US DOE.

On cross-examination, the Debtor indicated that he was working with an employment counselor.  He added that "my main problem is that a simple Google search

8

of my name turns up all sorts of unfavorable information."

The Debtor testified as to his current income and expenses. He currently receives Social Security Disability benefits in the sum of $991 per month, as well as food stamps. The sum of $254.60 is deducted from his benefits for child support. He is responsible for rent in the sum of $400 per month. In addition, he is obliged to pay $65 per month for probation fees (due to end in January 2014). He has medical and dental expenses, as well as expenses of approximately $60 every time he visits his daughter in Springfield, Massachusetts. Recently, he has had significant dental expenses of over $1,000. He paid his dentist $625 but owes an additional $421.

In his Schedules filed with his petition on October 5, 2012, the Debtor indicated that he owns no real estate; he valued his personal property at $3,600, all of which he claimed as exempt. Mr. Ablavsky maintains a checking account and, as of September 1, 2012, he had $393 in the bank account. Mr. Ablavsky does not own an automobile. No party objected to his claims of exemptions, and thus his property is exempt from the reach of creditors. The Debtor listed no creditors holding secured claims and no creditors holding priority claims. On Schedule F - Creditors Holding Unsecured Nonpriority Claims, he listed unsecured claims totaling approximately $243,000, mostly comprised student loan obligations. He listed credit card debts of less than $10,000. In his original Schedules I and J filed with his petition on October 5, 2012, the Debtor listed current income of $1,060 per month and current expenses of $1,245 per month. On Schedule I - Current Income of Individual Debtor(s), he stated that he was unemployed, although he listed monthly gross

wages of $100 with a net of $85 and $975 in social security disability income.  On Schedule

J - Current Expenditures of Individual Debtor(s), he listed expenses of $400 for rent, $350

for food, $75 for clothing, $20 for laundry and dry cleaning, $150 for medical and dental

expenses, and $250 for child support, totaling $1,245.  He did not list any expenses for

utilities, such as electricity or telephone, or transportation, insurance or recreation

expenses. He testified, however, that he incurred transportation expenses when he visited

his daughter.

On his amended Schedule I filed with the Court on October 23, 2012, Mr. Ablavsky

listed his income as $1,175.  The increase was due to a $200 line item for food stamps.  His

expenses exceed his income as adjusted.

The Chapter 7 trustee filed a report of no distribution on November 16, 2012.  The

Debtor received a discharge of dischargeable debts on January 2, 2013.

In sum, the most the Debtor has ever made in one year was $19,593 in 2010 from his

law practice.  Mr. Ablavsky testified that he believes that he cannot work full time due to

his bipolar condition and that he has been rejected from many jobs because of his criminal

record.    Because of his fluency in Russian, he has applied for tutoring and translating

positions at local colleges and hospitals, but he has not found employment in those fields.

He also has applied for office jobs and a job as an investigator.  He applied for a telephone

fund raising job and was rejected due to his criminal record.  He has applied for two

hospital jobs and was rejected due to his criminal record.

Mr. Ablavsky conceded that he could be employed for the part-time seasonal job for

the Salvation Army.   He did not think he could perform the job as a carriage attendant at PriceRite but admitted that he had an offer for hourly employment there which he did not accept.  He has not undertaken training to obtain other skills such as plumbing or teaching, although he has applied for jobs as a tutor to no avail. The Debtor is hampered in his job search as he does not drive due to his inability to concentrate.

WNEU, which is owed $6,698, granted Mr. Ablavsky a one year forbearance on his student loan on February 10, 2011 and an additional forbearance for one year on April 20, 2012.  He made a payment to WNEU in August 2010 for $191, but none since then.

The Debtor received economic hardship deferrals from the US DOE on his student loan in 2005 and 2006 both of one-year durations.  He has not applied to the US DOE for the income based repayment plan.  Additionally, he has not applied to the US DOE for total and permanent disability status.

C. The Expert Testimony of Plaintiff's Treating Psychiatrist

Dr. Charles Popper, a clinical associate in psychiatry at McLean Hospital and an instructor at Harvard Medical School, testified at trial.  He has treated the Debtor for approximately 10 years.  The parties stipulated that he is an expert on bipolar disorder and its treatment.

Dr. Popper has been a psychiatrist since 1976. He graduated from Princeton University and Harvard Medical School and did his residencies at Massachusetts General Hospital and McLean Hospital.  He spent three years at the National Institute of Health. He is board certified in general, child, and adolescent psychiatry.   He was a Lt.

Commander in the Public Health Service.  He is on the staff of McLean Hospital, the faculty of Harvard Medical School and maintains a private practice. Dr. Popper established the Child and Adolescent Psychopharmacology Program at McLean Hospital in 1979 and directed it for fourteen years.  Dr. Popper served as a member of the Massachusetts Governor's Task Force on Mental Health of Children and Youth, Chair of the Education Committee of the Academy of Child and Adolescent Psychiatry, and is a member of a number of professional associations.  He is well-known for his work in the field of bipolar disorder. Dr. Popper is widely published and is the author of numerous publications, including textbook chapters, studies, and original articles in psychiatric journals related to bipolar disorder.  He is primarily a clinician, spending the majority of his time in private practice. Dr. Popper did not receive any compensation or reimbursement for his participation in this student loan litigation.

Dr. Popper recounted the Debtor's mental health history and abilities and offered an opinion on Mr. Ablavsky's ability to obtain employment.  Dr. Popper related the Debtor's family and medical history, noting that his parents divorced when the Debtor was four years old; that he was placed in a sanatarium in St. Petersburg, Russia for one month when he was six years old because of behavioral problems, and that his separation from his father at age nine when he and his mother immigrated to the United States was traumatic.  Dr. Popper also noted that the Debtor saw a psychotherapist for the first time at the age of nine and that his clinical situation deteriorated over the course of his adolescence.  He had  problems in school including cognitive issues; at  the age of sixteen,

12

he was prescribed psychiatric medications for the first time.  He was abandoned by his father shortly after that.

Dr. Popper noted that Mr. Ablavsky was diagnosed with bipolar disorder at the age of eighteen when he was a freshman at Boston University.  He withdrew from college due to mental health issues, later enrolling at Brandeis University from which he was later expelled for making a bomb threat, which resulted in his conviction of a crime and five years of probation.  During law school, according to Dr. Popper, " he was generally viewed as argumentative and -- by his classmates and actually, several of his classmates approached the dean because they were concerned about his behavior and were concerned that he might be dangerous." After his law school , Mr. Ablavsky experienced significantly more stress in setting up a private practice, leading to impulsive and poor judgments. After his arrest, Mr. Ablavsky spent two months at Bridgewater State Hospital and then in the Middleton House of Correction.  According to Dr. Popper, Mr. Ablavsky received "high intensity and extended day treatment at the Elliot Mental Health Center where he would go I believe it was three -- ranging from three to five, generally four days a week, spend the day there, get various types of – various types of therapy and support."  He added:

> Throughout this period he had been functioning at a very low level and especially after the end of the house arrest when he began to attempt to look around and find employment and experienced -- began to experience the reality of what his past record was going to mean for his present and future life, he was extremely, extremely humiliated, demoralized, dealing with the many different types of losses that that entailed including changes in a self concept and his -- really traumatic affects [sic] on his self-esteem. He continued to have the post-traumatic recollections of the assault and was

13

dealing with realities of the barriers to getting a job.

Dr. Popper testified that he currently prescribes Mr. Ablavsky a number of medications for his bipolar and anxiety disorders, including anti-psychotic (Risperidone), anti-depressant (Inositol, Paroxetine, Lamotrigin), anti-anxiety and anti-convulsant (Gabapentin) drugs, mood stabilizing drugs (Valproate, Thioridazine, Olanzapine), as well as Omega 3 fatty acids.  In the past, he prescribed the Debtor lithium and anti-depressants, such as Sertraline, and anti-anxiety drugs, such as Clonazepam, which varied in their efficacy. The Debtor is not prescribed lithium due to its adverse effect on his kidneys.  The drugs Mr. Ablavsky currently takes have numerous and significant side effects, including increased heart rate, drowsiness, slowed cognition, and fatigue.

Dr. Popper expressed the opinion that it is essential that Mr. Ablavsky take all of these medications to avoid mania, depression, agitation, impulsivity, poor judgment, suicidality, and instability. According to Dr. Popper, without them, he would likely be hospitalized.  At present, the Debtor has a diagnosis of bipolar I disorder, which can result in full manic symptoms and psychosis, and in which a patient can show both manic and depressive symptoms concurrently.  Mr. Ablavsky is currently in a depressive phase.  He also has a panic disorder with agoraphobia, severe anxiety which causes panic attacks, and post-traumatic stress disorder, caused by his father's abandonment of him, by the severe beating he received from his neighbor, and by his incarceration, which due to withdrawal from all his medications led to an episode where he was psychotic and delirious.  In addition, Dr. Popper noted that the Debtor is humiliated and depressed over the loss of

14

career, the shame he has caused his family, and the damage he caused the legal profession and himself.

Dr. Popper testified that Mr. Ablavsky has significant cognitive disabilities, independent of his psychiatric disorders, including executive dysfunction and right hemisphere disorder. Dr. Popper explained that the right hemisphere disorder that afflicts the Debtor means that the right portion of his brain operates at a severe deficit compared to the left portion of his brain, resulting in a significant limitation of his cognitive processing abilities. Mr. Ablavsky's executive dysfunctions make it extremely difficult for him to multi-task and solve problems, both essential skills to functionality in the work place.

In summary, Dr. Popper indicated that Mr. Ablavsky does not act appropriately in social situations, and his abilities to solve problems and perform multiple tasks are impaired. Moreover, he is impulsive and has poor judgment. According to Dr. Popper, Mr. Ablavsky's executive dysfunction is worse today than it was when he was in law school, and he could not manage professional employment. In addition, Dr. Popper testified that his prognosis is poor due to the severity of his mental illness. His response to medications is limited, and his right hemispheric disorder cannot be treated with his limited resources. His executive dysfunction cannot be treated at all. His depression continues, compounded by his overwhelming guilt about his disgrace, his inability to support his daughter, the disappointment suffered by his mother and his feelings of worthlessness and hopelessness.

Dr. Popper opined that the Debtor can only work part time at a low stress, minimum wage, menial job. He cannot work in any stressful jobs. Moreover, his ability to work is negatively impacted by his medications, which cause sedation, mental fogginess, tiredness, and slowness of thought. His employment future is guarded, and his prospects are limited, although Dr. Popper conceded that the Debtor is intelligent, has not had any psychotic episodes recently, and his criminal probation period ends in January 2014.

Dr. Popper further testified that, because Mr. Ablavsky is currently undergoing pharmaceutical and therapeutic treatment for his numerous disorders, constant vigilance and readjustment of dosages of his medication is necessary to insure their efficacy and to limit their potential side effects. Treatment for his right hemispheric syndrome is not only prohibitively expensive, but also rarely undertaken in adults. Medical advances have not been made that can treat or mitigate the executive dysfunctions afflicting Mr. Ablavsky.

Neither the US DOE nor WNEU called any witnesses to testify. Neither defendant produced evidence from occupational or employment experts as to the existence of employment available to the Debtor given the severity of his psychiatric problems which precipitated the conduct resulting in criminal convictions.

## IV. POSITIONS OF THE PARTIES

The US DOE argues that the Debtor has failed to sustain his burden of showing that his student loans should be discharged for undue hardship. The US DOE claims that there are other possible professions available to him and that his inability to work in his chosen profession is due to criminal behavior. It argues that Mr. Ablavsky has not made any effort

16

to participate in any alternative repayment options available to him and has not applied

to the US DOE for a determination of total and permanent disability which might result in

an agreed upon discharge.   According to the US DOE, the Debtor cannot work as an

attorney due to his criminal record and discharge of a debt due to criminal conduct "would

send the wrong message."   It appears to argue that the Debtor's inability to work in his

chosen field is of his own doing and that he should not benefit from criminal conduct.

WNEU also argues that the Debtor has failed to sustain his burden of proof of undue

hardship and that he is not entitled to a discharge of his student loans.  It emphasizes that

despite his diagnosis of bipolar disorder, Mr. Ablavsky was able to graduate from college

and law school, and pass the bar examination.  WNEU points to what it characterizes as

clear evidence of his ability to earn a minimum wage at jobs other than the practice of law.

Counsel for WNEU suggested that the Debtor undertake work as a title searcher or an

independent contractor working from home in order to continue with legal work. It argued

that it offered the Debtor the option of paying $50 per month towards his law school debt,

but the Debtor rejected its offer.

The Debtor argues that he has shown undue hardship under the totality of the

circumstances because now, and in the future, he cannot maintain a minimal standard of

living for himself and his dependent while paying his student loans, which total

approximately $82,000.  The Debtor points to his diagnoses, including bipolar disorder,

post-traumatic stress disorder, anxiety, right hemisphere syndrome, and executive

dysfunction, in support of his assertion that repayment of the loans would constitute an

undue hardship.  In addition, he points to the numerous medications he must take which

negatively affect his ability to work, particularly the side effect of drowsiness.  He also

highlights Dr. Popper's characterization of his very limited work skills due to his inability

to handle stress and emphasizes that his current monthly expenses and income do not

permit payments to his student loan creditors.

In response to the US DOE's argument that a discharge in this case would reward

criminal behavior, the Debtor emphasizes that his criminal conduct was due to mental

illness, adding that he was found not to be criminally responsible for his conduct in state

court by virtue of mental illness but chose to plead guilty.  Finally, the Debtor argues that

he is in a significantly worse position than debtors in cases such as Educ. Credit Mgmt.

Corp. v. Bronsdon, 435 B.R. 791 (B.A.P. 1st Cir. 2010), and Dufresne v. NH Higher Educ.

Assistance Foundation (In re Dufresne), 341 .R. 391 (Bankr. D. Mass. 2006), because he is

disabled by virtue mental health illness, while the debtors in those case were not.

Notably, neither student loan creditor urged the Court to adopt a particular test to

determine undue hardship.

**V. APPLICABLE LAW**

Section 523 (a)(8) of the Bankruptcy Code, entitled Exceptions to Discharge, provides

in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
> title does not discharge an individual debtor from any debt–
>
> > (8) unless excepting such debt from discharge under this
> > paragraph would impose an undue hardship on the debtor and
> > the debtor's dependents, for–

> (A)(i) an educational benefit overpayment or
> loan made, insured, or guaranteed by a
> governmental unit, or made under any program
> funded in whole or in part by a governmental
> unit or nonprofit institution; or
>
> (ii) an obligation to repay funds received as an
> educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified
> education loan, as defined in section 221(d)(1) of
> the Internal Revenue Code of 1986, incurred by
> a debtor who is an individual;

11 U.S.C. § 523(a)(8).  The Bankruptcy Code does not define "undue hardship," and the

statute does not provide guidance.   Nevertheless in Nash v. Conn. Student Loan

Foundation (In re Nash), 446 F.3d 188 (1st Cir. 2006), the United States Court of Appeals

for the First Circuit observed that debtors have "a formidable task" in establishing undue

hardship because "Congress has made the judgment that the general purpose of the

Bankruptcy Code to give honest debtors a fresh start does not automatically apply to

student loan debtors. Rather, the interest in ensuring the continued viability of the student

loan program takes precedence." Id. at 191 (citing TI Fed. Credit Union v. DelBonis, 72 F.3d

921, 937 (1st Cir. 1995)).

In Ayele v. Educ. Credit Mgmt. Corp. (In re Ayele), 468 B. R. 24 (Bankr. D. Mass.

2012), aff'd, 490 B.R. 460 (D. Mass. 2013), and Stevenson v. Educ. Credit Mgmt. Corp. (In re

Stevenson), 463 B.R. 586 (Bankr. D. Mass. 2011), aff'd, 475 B.R. 286 (D. Mass. 2012) this Court

stated:

> Under 11 U.S.C. § 523(a)(8), the creditor has the initial burden of establishing
> that the debt qualifies as the type excepted from discharge, and the debtor

has the burden of establishing that excepting the debt from discharge will cause an undue hardship on the debtor or his or her dependents. *See* Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010) (citations omitted).

Ayele, 468 B.R. at 30. In Stevenson, this Court observed that in determining whether a debtor has satisfied the burden in showing undue hardship, courts differ on the proper test to apply. Id. at 493. The Second Circuit's test set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir.1987) ("the Brunner test"), has been adopted by a number of circuits. The Brunner test is a three-part test which requires the debtor to prove:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

> (3) that the debtor has made good faith efforts to repay the loans.

Brunner, 831 F.2d at 396. *See e.g.*, Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1309 (10th Cir. 2004); U.S. Dept. of Educ. v. Gerhardt (In re Gerhardt), 348 F.3d 89, 91 (5th Cir. 2003); Hemar Ins. Corp. v. Cox (In re Cox), 338 F.3d 1238, 1241 (11th Cir.), *reh'g denied*, 82 Fed. App'x 220 (11th Cir.2003), *cert. denied*, 541 U.S. 991, 124 S.Ct. 2016, 158 L.Ed.2d 496 (2004); Ekenasi v. Educ. Res. Inst. (In re Ekenasi), 325 F.3d 541, 546 (4th Cir. 2003); United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1112 (9th Cir. 1998); Pa. Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1995), *cert. denied*, 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996); and In re Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993). *See also* Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler), 397 F.3d 382,

385 (6th Cir. 2005) (in which the Sixth Circuit abandoned its hybrid- Brunner test and

adopted the Brunner test).

Other courts have adopted "the totality of the circumstances test" which requires

the court to consider "(1) the debtor's past, present, and reasonably reliable future financial

resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living

expenses; and (3) any other relevant facts and circumstances surrounding each particular

bankruptcy case." Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554 (8th

Cir. 2003).  Although the First Circuit has not adopted either test, this Court in Nash v.

Conn. Student Loan Foundation (In re Nash), No. 02–1466, Slip op. (Bankr. D. Mass. June

18, 2004), aff'd, 330 B.R. 323, 327 (D. Mass. 2005), and the United States Bankruptcy

Appellate Panel for the First Circuit have adopted the "totality of the circumstances test."

Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 801 (B.A.P. 1st Cir.

2010). The Bankruptcy Appellate Panel, and the majority of courts in Massachusetts, have

adopted the "totality of the circumstances test" because "the Brunner test 'test[s] too

much'" and because the good faith requirement lacks support within the language of §

523(a)(8). Bronsdon, 435 B.R. at 800–801. In Nash, the United States Court of Appeals for

the First Circuit, in refusing to adopted either test, stated:

> We see no need in this case to pronounce our views of a preferred method of
> identifying a case of "undue hardship." The standards urged on us by the
> parties both require the debtor to demonstrate that her disability will prevent
> her from working for the foreseeable future. Appellant has a formidable task,
> for Congress has made the judgment that the general purpose of the
> Bankruptcy Code to give honest debtors a fresh start does not automatically
> apply to student loan debtors. Rather, the interest in ensuring the continued
> viability of the student loan program takes precedence. TI Fed. Credit Union

_v. DelBonis_, 72 F.3d 921, 937 (1st Cir. 1995).

_Nash_, 446 F.3d at 190–91.

The difference between the two tests is the requirement of proof of good faith effort to repay the student loan, which is required under the _Brunner_ test, but not under the "totality of the circumstances" test, although, under the "totality of the circumstances" test, courts consider participation in one of the available income contingent repayment plans as one of several factors. The panel in _Bronsdon_ observed:

> Courts considering the ICRP as a factor under the totality of the circumstances test evaluate both the benefits and drawbacks of the program for the individual debtor within his or her unique circumstances. _Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks)_, 406 B.R. 382, 393 (Bankr. D. Minn .2009). Although these courts acknowledge that the ICRP reduces the immediate debt burden of the student loan debtor, they are often concerned about the longer term debt and tax consequences of the program. They recognize that, although it may be appropriate to consider whether a debtor has pursued her options under the ICRP, participation in that program may not be appropriate for some debtors because of the impact of the negative amortization of the debt over time when payments are not made and the tax implications arising after the debt is cancelled. Because of these considerations, the ICRP may be beneficial for a borrower whose inability to pay is temporary and whose financial situation is expected to improve significantly in the future. _See_ _In re Vargas_, 2010 WL 148632, at *4–5, 2010 Bankr.LEXIS 63, at *12–13. Where no significant improvement is anticipated, however, such programs may be detrimental to the borrower's long-term financial health. _See_ _id.; see also_ _In re Wilkinson–Bell_, 2007 Bankr.LEXIS 1052, at *16.

_Bronsdon_, 435 B.R. at 802.

Following this Court's decision in _Stevenson_, the United States Court of Appeals for the First Circuit in an unpublished judgment, dated September 23, 2011, affirmed the decision of the United States Bankruptcy Appellate Panel in _Bronsdon_. It noted that the

debtor had demonstrated undue hardship under both the totality of the circumstances test and the <u>Brunner</u> test. The First Circuit again stated that it would not rule on which of the two tests is appropriate.

A review of the numerous student loan discharge decisions in this jurisdiction reveals that proof of undue hardship is a heavy burden and depends on the debtor's particular circumstances. *See, e.g.*, <u>Smith v. U.S. Dept. of Educ. (In re Smith)</u>, 499 B.R. 55, 62 (Bankr. D. Mass. 2013); <u>Nargassans v. Suntrust Banks, Inc. (In re Nargassans)</u>, No. 10-1170, 2013 WL 3545846 (Bankr. D. Mass. July 11, 2013); <u>Arroyo v. U.S. Dept. of Educ. (In re Arroyo)</u>, 470 B.R. 18 (Bankr. D. Mass. 2012); <u>Sanborn v. Educ. Credit Mgmt. Corp. (In re Sanborn)</u>, 431 B.R. 5 (Bankr. D. Mass. 2010). Courts that consider income contingent repayment programs conclude that if participation in repayment programs is bound to be futile then participation should not be a condition of proof of undue hardship. *See* <u>Krieger v. Educ. Credit Mgt. Corp.</u>, 713 F.3d 882, 884 (7th Cir. 2013).

## VI. ANALYSIS

Applying these principles to the facts of the present case, the Court finds that the Debtor has sustained his burden of showing that repayment of both loans owed to the defendants would impose an undue hardship on him. The evidence clearly established that, despite the Debtor's education, his mental illnesses and impairments, coupled with the side effects of medications he is required to take, impair his functioning. His circumstances have prevented him from obtaining meaningful employment and will do so long into the foreseeable future. He is unqualified for gainful employment at any more

23

than part-time minimum wage jobs which will pay him an amount which is likely to be insufficient to meet his current and future modest living standard.

There was substantial and unrebutted evidence presented at trial of the Debtor's severe mental illnesses and deficits.  His own testimony and the corroborating medical evidence in the form of the opinion of his psychiatrist, an esteemed professional, established that he suffers from severe impairments due to his various mental conditions. There was unrebutted evidence that he cannot work full time and that he can only do part time menial and low stress jobs due to his mental illness.  Given his mental illnesses and criminal record, he has been unable to find permanent, part time employment that he can manage.  The Court finds that he has shown that he is currently unemployable at any more than a menial job and that he lacks meaningful employment prospects for the foreseeable future. His job search is hampered by his mental illnesses and criminal record, and he does not own, and indeed should not drive an automobile, further curtailing his employment prospects. He lacks social skills and, as Dr. Popper testified, he can sometimes cause people concern as to his dangerousness when he is manic.

There was no evidence presented that Mr. Ablavsky is capable of doing independent contract work, paralegal work, title searching, or appraising real estate as suggested by counsel to the defendants during cross-examination.  There was no evidence presented that such jobs are available generally to someone with mental impairments and a criminal record.  The defendants did not introduce any evidence, through direct testimony or by cross-examination of the Debtor and Dr. Popper that Mr. Ablavsky could perform such

24

tasks, or that such jobs, whether as a salaried position, or by independent contract, would

be available to him.  The defendants did not impugn the Debtor's credibility or rebut his

testimony with respect to his limitations.  Moreover, Dr. Popper's unrebutted opinion,

based on his years of treating the Debtor, established that Mr. Ablavsky could not handle

the stress of self-employment or the responsibilities of such positions without a breakdown.

His track record of breakdowns and bad decisions (bomb threats, tampering with court

files) compels the conclusion that he could not.

The Debtor's current income and expenses preclude him from making any payment

on the loans.  If forced to repay his loans, he could not maintain a minimal standard of

living, as his current monthly expenditures exceed his current monthly income.  He has

demonstrated inability to pay and his hardship is truly exceptional.  His earning prospects

and future are grim.  In short, his current circumstances are likely to persist into the distant

future.  His mental illness manifested itself at a very early age and his condition has not

improved, only worsened, despite years of treatment and administration of numerous

medications.  The Debtor has shown through unrebutted evidence that the effect of his

illnesses on his future prospects and on his ability to work is substantial and devastating.

When his illnesses and impairments are combined with his criminal record, the Court has

no doubt that he is unemployable for the foreseeable future.  He has shown that the

conditions creating an undue hardship now will not abate over time. He has shown that

participation in any of the available income contingent repayment plans established by the

student loan creditors would be illusory and futile. He made a payment of $191 on his

student loans, and thus demonstrated that he made an effort to repay.

This is not a situation, as the US DOE contends, where a student loan discharge rewards a Debtor for bad or criminal behavior. The Court is convinced that the Debtor's criminal behavior was caused by his mental illnesses. Mr. Ablavsky is not a criminal seeking to obtain a windfall. The Court is persuaded that the Debtor is substantially impaired by mental illnesses and cognitive deficits and is and will be incapable of repaying his student loans.

## VII. CONCLUSION

Under either the totality of the circumstances or the <u>Brunner</u> test, based on the evidence introduced at trial, the Debtor has shown by a preponderance of the evidence that excepting his student loans to both US DOE and WNEU would impose on him an undue hardship under 11 U.S.C. § 523(a)(8). Accordingly, this Court shall enter judgment in favor of the Plaintiff and against the Defendants.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: January 23, 2014